**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **WENDELL JOHNSON,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 11-CV-580-NJR** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Following a two-day jury trial, Wendell Johnson was convicted on two counts of distribution of crack cocaine and sentenced as a career offender to 300 months in prison. Following an unsuccessful direct appeal to the Seventh Circuit, Johnson filed a *pro se* Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 ("§ 2255 petition" or "habeas petition"). Counsel was later recruited for Johnson and given leave to file an amended § 2255 petition (Doc. 50), which is currently before the Court. Also before the Court is the Government's motion seeking to strike two attorney affidavits that Johnson submitted with his amended § 2255 petition (Doc. 51). For the reasons explained below, the Government's motion to strike is granted, and Johnson's § 2255 petition is denied.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  Underlying Criminal Case

The Drug Enforcement Administration and the Alton Police Department began

investigating Wendell Johnson after a confidential source informed them that he had purchased crack cocaine from Johnson more than ten times during the previous year. *United States v. Wendell Johnson*, SDIL Case No. 3:09-cr-30025, Doc. 36. The agents then had the confidential source conduct two controlled buys of crack cocaine from Johnson in February 2009. *Id.*

Shortly thereafter, on March 17, 2009, Wendell Johnson was indicted on two counts of distribution of crack cocaine. SDIL Case No. 3:09-cr-30025, Doc. 1. The case was assigned to Judge William D. Stiehl. Assistant Federal Public Defender Stephen Williams was appointed to represent Johnson. *Id.* at Doc. 12. Mr. Williams withdrew three weeks later, however, and Assistant Federal Public Defender Renee Schooley took over. *Id.* at Docs. 16, 37. Johnson's case went to trial in June 2009. After a two-day trial, the jury found Johnson guilty on both counts of distributing crack cocaine. *Id.* at Docs. 30, 31. Following the trial, Johnson complained about Ms. Schooley's representation, so she sought to withdraw. *Id.* at Doc. 37. Ms. Schooley's motion was granted, and Rodney Holmes, a member of this district's Criminal Justice Act panel, was appointed to represent Johnson at his sentencing. *Id.* at Doc. 40.

According to the presentence investigation report ("PSR"), Johnson's relevant conduct was 4.3 grams of crack cocaine. SDIL Case No. 3:09-cr-30025, Doc. 36. This resulted in a total offense level of 22 under the drug quantity table in § 2D1.1. *Id.* The PSR further indicated that a two-level enhancement for obstruction of justice was applicable because Johnson disclosed the identity of a cooperating witness to an acquaintance during recorded telephone conversations. *Id.* Thus, Johnson's total adjusted offense level

was 24. The PSR also concluded, however, that Johnson was a career offender under U.S.S.G § 4B1.1 based on two previous convictions for robbery, two previous convictions for aggravated battery, and a previous conviction for unlawful delivery of a controlled substance. *Id.* With the career offender enhancement, Johnson's total offense level jumped to 34. *Id.* With a criminal history category of VI, Johnson's advisory guideline range was 262 to 327 months. *Id.*

Before the sentencing hearing, attorney Rodney Holmes filed objections to the PSR. SDIL Case No. 3:09-cr-30025, Doc. 46. He argued that Johnson's relevant conduct should only be 2.8 grams of crack cocaine, and he objected to the two-level enhancement for obstruction of justice. *Id.* Consequently, according to Mr. Holmes, Johnson's offense level should be 18. *Id.* Mr. Holmes also filed a motion for a downward departure from the sentencing guidelines. *Id.* at Doc. 37. He argued that Johnson's traumatic childhood, history of drug and alcohol abuse, mental disorder diagnoses, and the fact that Johnson never received adequate treatment for any of these things, justified a downward departure from the career offender guideline sentence. *Id.*

Johnson's sentencing hearing was held on October 14, 2009, in front of Judge Stiehl. SDIL Case No. 3:09-cr-30025, Docs. 49, 53, 53. Judge Stiehl overruled Johnson's objection regarding his relevant conduct and concluded Johnson was responsible for 4.3 grams of crack cocaine. *Id.* at Doc. 60. Judge Stiehl sustained Johnson's objection on the obstruction enhancement and concluded that it did not apply. *Id.* Thus, Judge Stiehl concluded Johnson's adjusted offense level was 22. *Id.* Judge Stiehl further concluded, however, that the career offender enhancement applied, and Johnson's offense level was

actually a 34. *Id.* With a criminal history category of six, Johnson's guideline sentencing range was 262 to 327 months. *Id.* Neither party objected to this calculation. *Id.*

Mr. Holmes was then given an opportunity to present mitigation evidence and argument. SDIL Case No. 3:09-cr-30025, Doc. 60. Mr. Holmes had no evidence, but he did elaborate on the arguments he made in his presentence motion for a downward departure from the career offender guidelines. *See id.* Mr. Holmes first noted that amendments to the crack cocaine guidelines were in the works, and the amount of crack cocaine Johnson was responsible for—4.3 grams—was small and less than the amount needed to trigger a statutory minimum sentence (five grams). *Id.* at p. 16. Mr. Holmes then pointed out that, at only eight years old, Johnson saw "his mother being gunned down by his father" and then a couple days later his father committed suicide. *Id.* at p. 17. Mr. Holmes argued these were "life-altering" events for Johnson, and he never received any counseling to cope with them. *Id.* Next, Mr. Holmes pointed out that Johnson's father was "extremely abusive" and would make the children drink alcohol when they cried or were restless. *Id.* Mr. Holmes argued that as a result of Johnson's childhood experiences, by age ten or eleven, Johnson was drinking alcohol and smoking marijuana on a daily basis. *Id.* Drugs and alcohol became Johnson's "coping device." *Id.* at p. 18. As an adult, Johnson was diagnosed with polysubstance abuse and severe anti-social personality disorder. *Id.* at p. 17. Mr. Holmes argued that these mental disorders "had bearing on [Johnson's] ability to make sound judgment and sound reason during his life." *Id.* at p. 18. He further argued that because of Johnson's socioeconomic status, he did not have the resources to seek help and get treatment. *Id.*

Mr. Holmes concluded by stating that "for 4.3 grams of crack cocaine, in light of the changes that are going through with the crack guidelines . . . the amount of drugs, [Johnson's] upbringing, the tragedy that [he] witnessed at a young age . . . the fact that he hasn't had treatment . . . the career offender guidelines are way--just entirely too much punishment." *Id.* at p. 19.

In response, the Government argued that over twenty-five years had passed since the tragedies of Johnson's childhood, and he had "time and time again to try to right his ways, and every time he [went] and commit[ted] new crimes." SDIL Case No. 3:09-cr-30025, Doc. 60, p. 21. In rebuttal, Mr. Holmes implored the Court not to "discredit" or "simply discard" the events of Johnson's childhood. *Id.* at p. 23. Most pertinently, Mr. Holmes argued that "these kind of tragedies had lifelong, scarring effects. And especially with young children, they affect their development, their maturity, their intellectual development, [and] their emotional development." *Id.* Mr. Holmes also reminded Judge Stiehl that Johnson received social security benefits for his mental disorders—borderline intellectual functioning, intermediate explosive disorder, impulse control disorder, and mood disorder. *Id.* at p. 22.

Judge Stiehl considered all of the arguments by both parties and the 18 U.S.C. § 3553(a) factors and sentenced Johnson to a 300 month term of imprisonment. SDIL Case No. 3:09-cr-30025, *see* Doc. 60, pp. 24, 25, 26. He stated that the death of Johnson's parents "obviously had an effect on him, as it would anyone," and it was "clearly a mitigating factor." *Id.* at p. 24. Then Judge Stiehl stated that he also had to take into consideration Johnson's criminal record. *Id.* "I think he's had something like twelve

convictions, starting at age 11. He has not learned from any of those apparently. He was treated very gently initially, and he went on, and some of the penalties he received were a little more stringent, but he has not learned from them obviously." *Id.* Judge Stiehl went on to say that other than the death of Johnson's parents, "I find nothing in his record to suggest leniency to this Court." *Id.* at p. 25. His conduct "has been reprehensible throughout his life both as a minor and once he reached adulthood." *Id.* Judge Stiehl explained that in imposing the 300-month sentence, he had to consider "not only the effect it has on [Johnson], but what it can do to help society." *Id.* He believed the sentence was sufficient to punish Johnson, to deter others, and to "protect society" from Johnson's criminal activities "for a substantial period of time." *Id.*

Johnson appealed his conviction and sentence to the Seventh Circuit Court of Appeals. *United States v. Johnson*, 624 F.3d 815 (7th Cir. 2010). Mr. Holmes continued to represent Johnson on direct appeal. On October 26, 2010, Johnson's conviction and sentence were affirmed by the Seventh Circuit Court of Appeals. *Id.*

**B.  § 2255 PETITION**

Johnson filed his *pro se* Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 on July 5, 2011 (Doc. 1). The case was assigned to Judge Stiehl. After being ordered to respond to the petition, the Government filed its response to Johnson's habeas petition on November 9, 2012 (Doc. 11; Doc. 18). Two weeks later, Johnson filed a reply (Doc. 19).

Even though his § 2255 petition was fully briefed, Johnson requested counsel in December 2012 (Doc. 21). His request was granted, and Lee Lawless from the Federal

Public Defender for the Eastern District of Missouri entered his appearance on behalf of Johnson (Docs. 23, 24). Mr. Lawless sought leave of court to file an amended habeas petition and/or an amended reply (Docs. 25, 26). Judge Stiehl did not allow Mr. Lawless to further amend the habeas petition because it had already been amended and supplemented numerous times by Johnson; however, Judge Stiehl permitted Mr. Lawless to file an amended reply (Doc. 27). Mr. Lawless sought a number of extensions of time to file his amended reply in order to subpoena and gather records, interview Johnson, interview Johnson's relatives, and arrange a psychological evaluation of Johnson (Docs. 32, 34, 40).

In February 2014, before Mr. Lawless filed his reply brief, the case was reassigned to District Judge David Herndon. Three months later, it was reassigned to the undersigned. In the interests of justice, the undersigned gave Mr. Lawless permission to file an amended § 2255 petition (Doc. 47). On July 17, 2014, Mr. Lawless filed a Third Amended Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 (Doc. 50). The Government filed its response on February 18, 2015, and Johnson filed his reply on April 3, 2015 (Docs. 55, 57).

The § 2255 petition is now ripe for ruling. Johnson asks the Court to vacate, set aside, or correct his sentence based on ineffective assistance of his sentencing counsel, Rodney Holmes (Doc. 50). Specifically, Johnson claims that Rodney Holmes was ineffective because he:

(1)   failed to investigate and present mitigating evidence at Johnson's sentencing;

(2)   failed to correct errors in the presentence investigation report regarding Johnson's prior criminal convictions that qualified as predicate offenses for the career offender enhancement; and

(3)   failed to present a number of legal arguments and relevant authority for a sentence below the career offender guideline range.

## DISCUSSION

28 U.S.C. § 2255 requires a court to vacate, set aside, or correct the sentence of a prisoner in custody if it finds that "the sentence was imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255. "[R]elief under § 2255 is an extraordinary remedy because it asks the district court essentially to reopen the criminal process to a person who already has had an opportunity for full process." *Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007) (citing *Kafo v. United States,* 467 F.3d 1063, 1068 (7th Cir. 2006)). It "is available only in extraordinary situations, such as an error of constitutional or jurisdictional magnitude or where a fundamental defect has occurred which results in a complete miscarriage of justice." *Blake v. United States*, 723 F.3d 870, 878-79 (7th Cir. 2013) (citations omitted).

### I.   EVIDENTIARY HEARING

Courts can often decide § 2255 motions without an evidentiary hearing. *See Bruce v. United States*, 256 F.3d 592, 597 (7th Cir. 2001) ("A district court need not grant an evidentiary hearing in all § 2255 cases.") A hearing is not required if "the motion, files, and records of the case conclusively show that the prisoner is entitled to no relief." *Hutchings v. United States*, 618 F.3d 693, 699–700 (7th Cir. 2010) (*citing Torzala v. United States,* 545 F.3d 517, 525 (7th Cir. 2008)). On the other hand, a hearing should be granted

if the petitioner "alleges facts that, if proven, would entitle him to relief." *Hutchings,* 618 F.3d at 699 (citing *Sandoval v. United States,* 574 F.3d 847, 850 (7th Cir. 2009)).

Johnson has requested an evidentiary hearing (Doc. 50). In this instance, however, the Court finds that a hearing is not required. The parties have submitted conflicting evidence regarding Mr. Holmes's actions prior to sentencing; however, a hearing is not needed to determine the relative credibility of the evidence or to resolve the conflict, because it is clear that even if Johnson's version of events is correct, he cannot show that he suffered any prejudice. Thus he is not entitled to any relief, and no evidentiary hearing is required.

## II.   MOTION TO STRIKE ATTORNEY AFFIDAVITS (DOC. 51)

In support of his third amended § 2255 petition, Johnson submitted affidavits from two criminal defense attorneys, Jed Stone and George Taseff (Docs. 50-3, 50-4). The affidavits are submitted as expert opinions that Rodney Holmes's performance at sentencing was deficient and prejudicial to Mr. Johnson (Docs. 50-3, 50-4). The Government moved to strike both affidavits (Doc. 51).

Rule 702 of the Federal Rules of Evidence states that an expert may testify if his or her specialized knowledge will aid the trier of fact in determining a specific issue. The Court does not doubt Mr. Stone and Mr. Taseff's knowledge and experience, but in this instance, their opinions are not necessary to assist in understanding the evidence or determining any fact in issue regarding Mr. Holmes's performance. The Supreme Court has recognized time and again, "[t]here are countless ways to provide effective assistance in any given case, and that even the best criminal defense attorneys would not

defend a particular client in the same way." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quoting *Strickland v. Washington*, 466 U.S. 668, 689 (1984) (internal quotation marks omitted)). Additionally, given the regularity with which criminal sentencings occur in a district court, the undersigned is familiar with a wide-spectrum of approaches in investigating and presenting mitigating evidence and arguments in non-capital cases. Accordingly, the Court is satisfied that it can determine whether Mr. Holmes rendered ineffective assistance without the need for expert testimony. The Government's motion to strike is granted, and the affidavits of George Taseff and Jed Stone are stricken.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

A claim of ineffective assistance of counsel is properly raised in a § 2255 motion because it implicates the Sixth Amendment, which provides criminal defendants the right to counsel. U.S. CONST. amend. VI. "[A]nd inherent in this right is that the defendant is entitled to the *effective* assistance of counsel." *United States v. Recendiz*, 557 F.3d 511, 531 (7th Cir. 2009) (citing *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970)) (emphasis added). Generally speaking, counsel is ineffective when his or her "conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Recendiz*, 557 F.3d at 531 (quoting *Strickland v. Washington*, 466 U.S. 668, 686 (1984)).

"To demonstrate that the right to counsel was violated by ineffective assistance, a person challenging a conviction must meet the familiar two-part standard set forth in *Strickland*." *McElvaney v. Pollard*, 735 F.3d 528, 532 (7th Cir. 2013) (citing *Strickland*, 466 U.S. at 688). The petitioner must show that his counsel's performance was deficient,

"meaning it fell below an 'objective standard of reasonableness' informed by 'prevailing professional norms.'" *McElvaney*, 735 F.3d at 532 (quoting *Strickland*, 466 U.S. at 688). *See also Sussman v. Jenkins*, 636 F.3d 329, 349 (7th Cir. 2011) ("The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." (quoting *Harrington v. Richter*, 562 U.S. 86, 88 (2011))).

The petitioner also must show that "his counsel's deficient performance prejudiced him, meaning that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *McElvaney*, 735 F.3d at 532 (quoting *Strickland*, 466 U.S. at 688). More specifically, when challenging a sentence, "a petitioner must show that but for counsel's errors, there is a reasonable probability that he would have received a different sentence." *Griffin v. Pierce*, 622 F.3d 831, 844 (7th Cir. 2010) (citing *Strickland,* 466 U.S. at 695). "A reasonable probability is a probability sufficient to undermine confidence" in the sentence. *Taylor v. Bradley*, 448 F.3d 942, 950 (7th Cir. 2006) (quoting *Strickland*, 466 U.S. at 694). It is not enough to show that the errors possibly had "some conceivable effect" on the sentence. *Strickland*, 466 U.S. at 694.

"Surmounting *Strickland*'s high bar is never an easy task." *Harrington*, 562 U.S. at 105 (quoting *Padilla v. Kentucky,* 559 U.S. 356, 371 (2010)). *See also Shell v. United States*, 448 F.3d 951, 955 (7th Cir. 2006) ("[A] party bears a heavy burden in making a winning claim based on ineffective assistance of counsel." (citation omitted)); *Sullivan v. Fairman*, 819 F.2d 1382, 1391 (7th Cir. 1987) (explaining "few petitioners" are expected to be able to

pass through the "'eye of the needle' created by *Strickland*" (quoting *Matthew* 19:24)).

The Court may address the elements of the *Strickland* test "in whichever order is most expedient." *Watson v. Anglin*, 560 F.3d 687, 690 (7th Cir. 2009); *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.") A petitioner's "failure to satisfy either prong is fatal to his claim." *Ebbole v. United States*, 8 F.3d 530, 533 (7th Cir. 1993) (citing *United States v. Slaughter*, 900 F.2d 1119, 1124 (7th Cir. 1990)).

### A.  Failure to Develop Mitigating Evidence for Use at Sentencing

Johnson first argues that Rodney Holmes was ineffective at sentencing when he failed to investigate, develop, and present evidence of all the potential mitigating factors that could have reduced his sentence (Doc. 50, pp. 10–49). Johnson claims that Mr. Holmes relied exclusively on the limited information in the PSR and did not dig any deeper. According to Johnson, the information contained in the PSR should have prompted Mr. Holmes to obtain available records, such as school records, correctional institution records, and Social Security Administration records; to interview Johnson's family members; and to have Johnson evaluated by a mental health expert. As a result of Mr. Holmes's failure to do so, Johnson claims that Holmes was "ignorant of the full extent" of the abuse, neglect, and trauma he suffered as a child; his low IQ and limited education; his history of head injuries and loss of consciousness; his alcohol and substance abuse; and his struggles with mental and emotional problems issues, which left the judge with "an inadequate picture of Mr. Johnson's life" and "no framework for

understanding Johnson's functioning and behavior." (Doc. 50, pp. 13, 29, 45).

The Court is going to heed the Supreme Court's advice and skip the discussion of whether Mr. Holmes's performance was objectively deficient, because it is easier to dispose of Johnson's ineffectiveness claim on the ground of lack of sufficient prejudice. *Strickland,* 466 U.S. at 697.

In order to establish that counsel's failure to investigate mitigating circumstances was prejudicial, the petitioner must present new evidence that "alter[s] the sentencing profile presented to the sentencing judge." *Strickland*, 466 U.S. 668, 700 (1984). In other words, the new evidence "must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005). *See also Saranchak v. Sec'y, Pa. Dep't of Corr.*, 802 F.3d 579, 592 (3d Cir. 2015) ("must consider the strength of the evidence in deciding whether the *Strickland* prejudice prong has been satisfied." (citations omitted)); *Beuke v. Houk*, 537 F.3d 618, 646 (6th Cir. 2008) ("A petitioner does not establish prejudice if he shows only that his counsel failed to present 'cumulative' mitigation evidence, that is, evidence already presented to the jury"); *Blanton v. Quarterman*, 543 F.3d 230, 239, n.1 (5th Cir. 2008) (explaining that, in recent Supreme Court cases finding prejudice from trial counsel's failure to investigate, the mitigation evidence that the attorneys failed to uncover was "shocking and starkly different than that presented at trial.")

Johnson claims that the sentencing judge "was presented with virtually none of the available evidence of [his] excruciating life history, mental illness, [and] neurological and cognitive impairments." (Doc. 50, p. 1). That is an overstatement. The PSR

admittedly did not present Johnson's troubled life and mental and emotional problems in the most compelling manner. And Rodney Holmes could have dug a little deeper to make a rich, detailed presentation of Johnson's life. But that alone is insufficient to establish prejudice. *See Andrashko v. Borgen*, 88 F. App'x 925, 930 (7th Cir. 2004) ("Andrashko's counsel might have been able to present the mitigating factors in a more positive light, but such a possibility does not establish prejudice."); *United States v. Green*, 680 F.2d 183, 190 (D.C. Cir. 1982) ("It is at best pure speculation that more eloquent pleading would have resulted in a lower sentence.") *See also Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) ("To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable."). And it is clear from the information presented by the PSR and by Mr. Holmes at sentencing, the sentencing judge was aware, by and large, of the mitigating evidence that Johnson claims Holmes failed to present.

More specifically, based on the PSR and Rodney Holmes's arguments, the sentencing judge knew that Johnson's developmental years were rife with physical abuse, substance abuse, and extreme trauma. The PSR noted that Johnson's father was an alcoholic, a heroin addict, and extremely physically abusive. Johnson reported that his father "made" the kids drink alcohol to calm them down, and he was physically abusive to his mother "all of the time." Johnson characterized his mother as "a sweet, church-going lady, [who] was victimized by his father." He remembered his father "as a severe disciplinarian who 'tore their butts up'" and "forced his [wife] to discipline the children." When Johnson was eight years old, he saw his father fatally shoot his mother

and shoot his maternal grandmother in the face. Johnson and his siblings were only "spared . . . because his father ran out of bullets." Days later, Johnson's father committed suicide. The PSR notes that, following the death of their parents, Johnson and his siblings were split up amongst family members. Johnson and his two older siblings were raised by their maternal grandmother. Johnson reported that he never received counseling to help him cope with those events.

The sentencing judge knew that Johnson had a history of alcohol and substance abuse that began shortly after the death of his parents and continued, unabated, throughout his adult life. The PSR indicated that Johnson began smoking marijuana at age ten and drinking alcohol at age eleven. Johnson admitted having an "alcohol problem" as an adult and reported drinking "massive quantities on a daily basis." He stated he smoked marijuana "as much as possible," which was at least a couple times per week. Johnson also reported using cocaine on a daily basis since the age of seventeen. He attended substance abuse treatment in 2001 and 2007 as part of his probation (or parole), but he resumed using substances after completing treatment.

The sentencing judge also knew that Johnson's criminal activity began the year after his parents died, when he was just nine years old. That year he was arrested for shoplifting. He had two more arrests for theft and shoplifting before his first conviction at age eleven for residential burglary. He was again convicted of residential burglary at age twelve and of theft at age thirteen. At fourteen, he was arrested for attempted robbery, battery, delivery of marijuana, and resisting arrest. At sixteen, he was arrested in a bullet-riddled house with guns, ammunition, and cocaine; and on a separate

occasion he was arrested for aggravated assault involving a firearm.

Johnson's criminal activity continued into adulthood and sometimes involved a shocking and disturbing level of violence. He was convicted of robbery and burglary at age seventeen when he attacked a male victim and his mother at a gas station and stole their gun. That same year, he was convicted of robbery when he and three other men beat a fifteen-year-old with a pipe and stole his Los Angeles Raiders jacket. He was sentenced to six years' imprisonment but only served approximately two and a half years before being released on parole. Less than six months after being released on parole, Johnson was arrested for (and eventually convicted of) battery after an incident at a party where he threw a woman against the wall and choked her because she would not talk to him. That same year, Johnson was convicted of obstructing a police officer when he ran from the officer after being told to stop and dove headfirst through the glass door of a residence trying to get away.

At twenty-one, Johnson was convicted of criminal trespass. He was also convicted of aggravated battery and illegal possession of a weapon by a felon when, during a gang-related altercation at a tavern, he shot two men, one of whom sustained serious injuries to his buttocks and scrotum. He was sent back to prison and served close to five years before being paroled. Less than one year after he was discharged from parole, at the age of twenty-eight, Johnson was arrested for, and eventually convicted of, aggravated battery after he had sexual intercourse with a seventeen-year-old girl, who claims it was against her will. A year after that conviction, Johnson was arrested for, and eventually convicted of, obstructing a police officer, battery, and fleeing from a police

officer after he got in a scuffle with police officers in an attempt to prevent them from chasing down his brother Wardell. At age thirty-two, he was convicted of unlawful delivery of a controlled substance after he delivered fourteen grams of crack cocaine to a confidential source. Then, at the age of thirty-four, he was indicted in the underlying federal criminal case after selling crack cocaine on two occasions to a confidential source.

The PSR also tipped off the sentencing judge to Johnson's low IQ, limited education, and battle with psychological issues. Specifically, the PSR stated that Johnson only completed the eighth grade. It further stated that during an IDOC evaluation in 2007, Johnson was diagnosed with "polysubstance abuse" and "severe antisocial personality disorder." The PSR also revealed that Johnson was awarded Social Security Supplemental Security Income due to borderline intellectual functioning, intermittent explosive disorder, impulse control disorder, and a mood disorder. In other words, the Social Security Administration believed that Johnson was so crippled by his mental impairments that he was unable to obtain and/or maintain substantial, gainful employment.

Based on the PSR, the sentencing judge was also aware that Johnson's siblings were dealing with a host of mental health and legal issues. Specifically, the PSR indicated that Johnson's older sister, Melissa, was dead; she was stabbed to death in 2000 by his younger sister, ShaJuan, during a fight. ShaJuan was convicted of second-degree murder and sentenced to 20 years' imprisonment. Johnson also reported that "all of his brothers have violent tempers." His younger brother, DaJuan, was arrested three days before Johnson for selling crack cocaine; he was sentenced in December 2009 to ten

years' imprisonment. *United States v. DaJuan Williams*, SDIL Case No. 09-cr-30050-MJR. Johnson's younger brother, Tommie, was "an alcoholic," physically and mentally handicapped, and received Social Security disability benefits. His older brother, Wardell, was the only sibling who was not incarcerated and employed.

Despite all of the mitigating information in the PSR, Johnson faults Mr. Holmes for not finding more. Johnson's habeas counsel, Lee Lawless, conducted the investigation that he says Mr. Holmes should have done and submitted approximately 130 pages of evidence to the Court. In particular, Mr. Lawless obtained affidavits from Johnson's wife, Nicole; two of his aunts, Ruthie Johnson Owens and Viola Foster; and two of his cousins, Classie Butler and David Miller (Docs. 50-6, 50-8, 50-10, 50-14, 50-15). Mr. Lawless sent an investigator to speak with Johnson's brother Wardell, who is now incarcerated (Doc. 50-5). Mr. Lawless also obtained a number of records, such as police reports (Docs. 50-9, 50-11, 50-12, 50-16); records from Johnson's grade school (Docs. 50-19, 50-20); a transcript of Johnson's GED test results in 2010 (Doc. 50-23); correctional records from Johnson's incarcerations as a juvenile and an adult (Docs. 50-7, 50-13, 50-21); and records from the Social Security Administration related to Johnson's award of benefits (Docs. 50-24, 50-25). Mr. Lawless also had Johnson undergo two separate psychological evaluations (Docs. 50-1, 50-2).

The Court has reviewed all of the new information that came out of Mr. Lawless's investigation. Some of it is irrelevant to Johnson's sentencing, such as his father's military history, his father's criminal record, and the specifics of his father's death. Much of the new information simply mirrors the information that was already before the

sentencing judge; it is not significantly different in substance, only in volume and level of detail. In other words, it simply fleshes out the details of Johnson's social, academic, and psychological history that were previously presented in more general terms. That being said, some of the information presented by Mr. Lawless is arguably new. But as discussed below, the undersigned is unconvinced that Johnson would have received a lesser sentence had it been presented by Mr. Holmes to Judge Stiehl at the time of sentencing.

First, Johnson submitted some new information regarding his early life. His aunts attested that Johnson's father threatened to kill his mother more than once, and one time even put a gun to Johnson's head while threatening his mother (Docs. 50-6, 50-8, 50-10). Johnson's brother attested that he and Johnson initially went to live with their aunt, Viola Foster, after the death of their parents (Doc. 50-5; *see also* Doc. 50-8). Once their grandmother recovered from her gunshot wound and was released from the hospital, they moved in with her (Doc. 50-5; *see also* Doc. 50-8). Johnson's brother said they left Ms. Foster's house because she had thirteen children of her own and was very physically abusive (Doc. 50-5).[1] Their grandmother, however, was too old to keep up with young children and to properly supervise them (Docs. 50-5, 50-8). Johnson's brother said their grandmother would tell them what time to be home and then they would run free until their curfew (Doc. 50-5). Johnson would skip school to hang out with older individuals who sold drugs (Doc. 50-5). Additionally, during the habeas proceedings, Johnson

---

[1] Johnson's counsel wrote in his brief that "there were constant arguments and fighting" in Viola Foster's home, Johnson "was singled out for physical and mental abuse," and he "ran away" from the house "[t]o escape the abuse" (Doc. 50, p. 17). Counsel did not cite to a source for that information, however, and the Court did not come across it in the record.

reported at one of the psychological evaluations that he was sexually molested by an older cousin when he was five or six years old, and when he was in juvenile detention, he had to fight off older juveniles attempting to molest him (Doc. 50-2).

The Court finds this new information is of little value because it barely alters the sentencing profile presented to the sentencing judge. The sentencing judge was already aware that Johnson's father was violent and extremely abusive. The sentencing judge also knew that Johnson had a very traumatic and chaotic childhood, and he could easily surmise that Johnson was neglected, or at least improperly supervised, given that he was abusing alcohol and drugs and committing crimes before he even reached middle school. As for the sexual abuse, Johnson was unable to provide any details about the abuse, so the evidence is limited to his simple assertion that he was molested.

Johnson also submitted new information about his diminished intellectual capacity. School records show that, at age eleven when he was in the fifth grade, he was diagnosed as "learning disabled" because he had an auditory processing disorder, which led to difficulties reading, spelling, writing, and speaking, and he was deemed eligible for special education classes (Doc. 50-19). Within three years, Johnson was failing all of his classes, was at least two or more years behind in reading, had been held back at least once, and was frequently truant (Doc. 50-1; Doc. 50-20). Johnson reported at one of the psychological evaluations that he had difficulty reading in school and the other kids teased him for it, so he simply stopped going to school (Docs. 50-1, 50-2). Intelligence testing performed when Johnson was an adult demonstrated that his intellectual functioning was below normal (Docs. 50-1, 50-2, 50-25).

This information simply provides background details for the information presented in the PSR. It is not the type of information that alters the entire evidentiary picture presented to the sentencing judge, who was already aware of Johnson's diminished intellectual capacity and his dismal educational experience.

Johnson also submitted new evidence regarding his mental and emotional problems. His aunt, Viola Foster, attested that after the death of his parents, Johnson became "anxious and very fearful," and he started carrying a kitchen knife in his pocket (Doc. 50-8). Other family members agreed that, after the death of his mother, Johnson developed anger problems and had difficulty expressing his feelings (Docs. 50-5, 50-6, 50-8). As his brother put it, Johnson "seemed to snap." (Doc. 50-5). At age thirteen, while he was in juvenile detention, Johnson was evaluated, and it was noted that Johnson was "in need of psychological counseling on an ongoing basis" (Doc. 50-7). The evaluator stated that Johnson "puts up a 'tough guy,' street wise front," but he "is a child full of rage, fear and bitterness, very gullible and easily led by his older friends" (Doc. 50-7). The evaluator further warned that "[w]ithout intervention, [Johnson's] difficulties will continue to be expressed in anti-social behavior" (Doc. 50-7). At age fourteen, he was again evaluated in juvenile custody (Doc. 50-21). The psychologist diagnosed Johnson with a "conduct disorder, undifferentiated type" and noted that Johnson "closed himself off from his past experiences and, therefore, may be acting out to avoid having to think about things" (Doc. 50-21). She further noted that "[o]n the other hand, he also seems to have some antisocial features" that may be a result of "seeing the world in a very negative viewpoint since the death of his mother" (Doc. 50-21). Johnson received mental

health treatment a handful of times in juvenile custody, but it ended when he was released (Doc. 50-22). The psychiatrist who performed the first evaluation of Johnson during the habeas proceedings disagreed with previous evaluations that Johnson had anti-social personality disorder or intermittent explosive disorder (Doc. 50-2). Instead, he believed that Johnson's dysfunctional behavior is a result of post-traumatic stress disorder (Doc. 50-2). The psychologist who performed the second evaluation of Johnson during the habeas proceedings reached a similar conclusion (Doc. 50-1).

This information certainly provides more background and details concerning Johnson's mental and emotional health; but once again, this is not the type of information that alters the entire evidentiary picture presented to the sentencing judge. The undersigned does not believe that the specific diagnosis Johnson received at any given point in his life, or the soundness of that diagnosis in hindsight, is what matters. What matters is that Johnson struggled throughout his life with psychological problems that stemmed from his tremendously difficult childhood and contributed significantly to his criminal history. The sentencing judge, without a doubt, understood that.

Finally, Johnson submitted new evidence that he has a history of head injuries and loss of consciousness. During the habeas proceedings, Johnson reported at a psychological evaluation that he fell out of a tree as a child and hit his head (Doc. 50-2). He reported severe, chronic headaches following this fall, that continue to this day (*Id.*; Docs. 50-13, 50-15, 50-25). Johnson's cousin recalled that Johnson complained of severe headaches as a child (Doc. 50-14). Johnson also reported at the psychological evaluation that he sustained another head injury when he hit his head on a concrete building block

after he was tased by police (Doc. 50-2). He further reported frequent "blackouts," during which he becomes numb and unresponsive for about ten seconds (Docs. 50-2, 50-25). He claimed he had been involved in three car accidents due to loss of consciousness (Doc. 50-1). Police reports were submitted showing that in 2005, Johnson blacked out while driving and ran his car into a utility pole (Doc. 50-15; 50-17). As a result of that accident, his license was suspended for a year (Doc. 50-15; 50-18).

There is no indication that the sentencing judge knew of Johnson's history of head injuries and loss of consciousness. The purpose of this evidence is to imply that Johnson's head injuries caused his cognitive problems and perhaps a seizure disorder as well. But there is no evidence as to when the first head injury occurred and whether it predated Johnson's learning problems in school. There is also no medical evidence of a seizure disorder because Johnson did not receive medical care after either of his head injuries or his 2005 car accident, and he has never had a comprehensive neurological workup performed.

In sum, the new evidence submitted during these habeas proceedings is not so starkly different in strength and subject matter that it alters the entire evidentiary picture that was in front of the sentencing judge and seriously undermines the fairness and integrity of Johnson's sentence. And given Judge Stiehl's comments at sentencing, it seems quite clear that even if Rodney Holmes had presented all of this new evidence to Judge Stiehl, it is unlikely to have tipped the scales in Johnson's favor and resulted in a lesser sentence. Judge Stiehl's comments reveal that he considered the evidence of Johnson's background and saw some of it as mitigating. But Johnson's "reprehensible"

conduct throughout his life and his substantial criminal history showed that he repeatedly failed to learn from his prior crimes and the lenient treatment he received for those crimes. In sentencing Johnson to 300 months, Judge Stiehl placed considerable emphasis on the need to punish Johnson, deter others, and protect the public from further crimes by Johnson. As the Seventh Circuit stated, there was "merit to the district court's concern that giving a reduced sentence would not be in society's best interest." *United States v. Johnson*, 624 F.3d 815, 823 (7th Cir. 2010). In light of these comments, it is not reasonably probable that Johnson would have received a lesser sentence had Mr. Holmes conducted further investigation as opposed to relying on the information in the PSR.

### B. Career Offender Classification

Johnson next claims that Rodney Holmes was ineffective when he failed to object to inaccuracies in the PSR regarding Johnson's classification as a career offender under § 4G1.1 of the Sentencing Guidelines (Doc. 50, pp. 49–54). To qualify as a "career offender" under the Sentencing Guidelines, the offender must have been at least eighteen years old at time of instant offense, the instant offense was a felony that was either crime of violence or a controlled substance offense, and the offender had at least two prior felony convictions for crimes of violence or controlled substance offenses. U.S. SENTENCING GUIDELINES MANUAL § 4B1.1(a). Johnson makes no argument regarding the first two factors for career offender status; rather, his argument focuses on the third factor.

The PSR concluded that Johnson had five qualifying prior felony convictions:

1. Robbery (case number 91-CF-1494);

2. Robbery (case number 92-CF-249);

3. Aggravated Battery (case number 96-CF-1872);

4. Aggravated Battery (case number 03-CF-2448); and

5. Unlawful Delivery of Controlled Substance (case number 07-CF-349)

*United States v. Wendell Johnson*, SDIL Case No. 3:09-cr-30025, Doc. 36, p. 6. According to Johnson, the first predicate offense—a 1991 robbery—should not have been used as a prior felony for career offender purposes because he did not receive any criminal history points for this offense (Doc. 50, p. 50).[2] Johnson also argues that the fourth predicate offense—a 2003 aggravated battery, which charged that "he committed an act of an offensive nature in that he touched the victim in an offensive manner in a public place of accommodation"—should not have been used as a prior felony for career offender purposes because it was not a crime of violence (Doc. 50, p. 51).[3] But Mr. Holmes did not

---

[2] *See* U.S. Sentencing Guidelines Manual §§ 4B1.2(c), cmt. n.3, & 4A1.2(e). *United States v. Womack*, 610 F.3d 427, 431 n.4 (7th Cir. 2010) ("[T]he definitions for computing criminal history/points [in] U.S.S.G. § 4A1.2, also are used to count predicate convictions for purposes of U.S.S.G. § 4B1.1"); *United States v. Peters*, 215 F.3d 861, 862 (8th Cir. 2000) ("To qualify as a 'prior felony' for career offender purposes, the felony must receive criminal history points under subsection (a), (b), or (c) of 4A1.1.")

[3] An aggravated battery involving a forcible battery, meaning one that caused bodily harm, qualifies as a crime of violence while an aggravated battery involving an offensive battery, meaning "physical contact of an insulting or provoking nature," in the presence of one or more aggravating factors, does not qualify as a crime of violence. *United States v. Johnson*, 365 F. App'x 3, 5 (7th Cir. 2010) (prior Illinois conviction for aggravated battery or making contact of an insulting or provoking nature in a public place was not a crime of violence for purposes of the career offender guideline). *See also United States v. Hampton*, 675 F.3d 720, 730–31 (7th Cir. 2012) (prior Illinois conviction for aggravated battery for making insulting or provoking physical contact with a peace officer was not violent felony for purposes of Armed Career Criminal Act); *United States v. Evans*, 576 F.3d 766, 767 (7th Cir. 2009) (prior Illinois conviction for aggravated battery for making physical contact of an insulting or provoking nature against a woman known to be pregnant was not a crime of violence for purposes of the career offender guideline). *But see United States v. Aviles-Solarzano*, 623 F.3d 470, 475 (7th Cir. 2010) (prior Illinois conviction for aggravated battery for committing battery on a public way was a crime of violence where PSR contained a summary of state-court indictment that indicated defendant punched his victim in the face, and his attorney did not

object to the use of these convictions as predicate offenses for the career offender enhancement, and he did not object to the Government's statement that Johnson was a career offender "five times over" (*Id.* at p. 50). Johnson argues that because of Mr. Holmes's failure, he was "viewed as incorrigible and deserving of harsher punishment" (*Id.* at p. 50). The Government did not respond to this argument (*see* Doc. 55).

Assuming that Johnson is correct, and Mr. Holmes's performance was deficient because he failed to object to these two convictions as predicate offenses for the career offender enhancement, Johnson still cannot establish that he suffered prejudice. Even without counting 1991 robbery conviction and the 2003 aggravated battery conviction as predicate offenses, Johnson still would have qualified as a career offender by virtue of his three other prior felony convictions involving violence or controlled substances and accordingly "branded . . . a malefactor deserving of far greater punishment than that usually meted out for an otherwise similarly situated individual who had committed the same offense." *Narvaez v. United States*, 674 F.3d 621, 629 (7th Cir. 2011) (cited by *Meirovitz v. United States*, 688 F.3d 369, 373 (8th Cir. 2012)). "Any possible negative effect of the additional prior conviction(s) . . . was at most marginal." *Murrell v. Frank*, 332 F.3d 1102, 1120 (7th Cir. 2003).

Accordingly, there is no reasonable likelihood that but for Mr. Holmes's failure to object to the inclusion of the 1991 robbery and the 2003 aggravated battery as predicate

object to the accuracy of the summary); *United States v. Silva*, 583 F. App'x 546, 547 (7th Cir. 2014) (prior Illinois conviction for aggravated battery was a crime of violence where PSR stated that defendant stabbed a male victim with a knife, and defendant never objected to the summary of the charge in the PSR or otherwise challenged the probation officer's characterization of the conviction as a crime of violence).

offenses for the career offender enhancement that Johnson would have received a lesser sentence.

### C.  Failure to Argue for a Sentence Below the Career Offender Guideline

Johnson's final argument is that Rodney Holmes was ineffective when he failed to advance any number of "compelling" arguments for a lower sentence under § 3553(a) (Doc. 50, pp. 54–62). In particular, Johnson claims that Mr. Holmes could have made the following argument to the sentencing judge:

1) that the court had the discretion to impose a sentence below the career offender range because it produced a sentence greater than necessary to meet the purposes of sentencing (Doc. 50, p. 56);

2) that the career offender guidelines were unnecessarily harsh for Johnson because his instant and prior drug offense involved small quantities of drugs and because he received probation for his prior drug offense (Doc. 50, p. 59);

3) that the career offender guideline was not developed through the Sentencing Commission's usual method of examining past sentencing data and is not based on any empirical evidence (Doc. 50, p. 58);

4) that Johnson's youth at the time of his predicate offenses reduces his culpability and increases his potential for rehabilitation (Doc. 50, p. 59); further, counsel could have argued that Johnson's recidivism declines with age (Doc. 50, p. 61);

5) that Johnson's mental illness reduced the need for general deterrence, made incapacitation by imprisonment less appropriate, and rendered him less deserving of punishment (Doc. 50, p. 61).

Counsel "need not advance every conceivable argument . . . and assistance of counsel is constitutionally ineffective only if counsel fails to raise issues that are 'obvious' and 'clearly stronger' than the ones raised." *Stribling v. United States*, 142 F.3d 440 (7th Cir. 1998). A number of the arguments that Johnson claims Mr. Holmes should

have made were, in fact, made by Holmes at sentencing. He made clear that the court was free to impose a sentence below the career offender guideline range, and he argued that the court should do so because the career offender guidelines resulted in "just entirely too much punishment" in light of the small amount of drugs involved and Johnson's childhood and psychological problems. *See United States v. Wendell Johnson*, SDIL Case No. 3:09-cr-30025, Docs. 37, 60. *See supra* at pp. 4–5.

That leaves arguments three and four. Argument four is a non-starter. Johnson was not a youth at the time of two of his predicate offenses, which is all that is needed to establish career offender status. Specifically, he was 29 years old when he pleaded guilty to aggravated battery in Case 03-CF-2448. SDIL Case No. 3:09-cr-30025, Doc. 36, p. 11. And he was 31 years old when he pleaded guilty to unlawful delivery of a controlled substance in case 07-CF-349. *Id.* at p. 12. Furthermore, while recidivism rates typically decline as offenders age, in Johnson's case, statistics suggest there would be a better than 50% chance that he would commit further crimes.[4] Accordingly, the Court concludes that argument four is not a "strong" argument, and it cannot be said that Rodney Holmes was ineffective for not making it.

---

[4] Offenders with fourteen criminal history points, like Johnson had at the time of his sentence, have a 63.4% recidivism rate. U.S. Sentencing Comm'n, "Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines," p. 23 (May 2004) (*available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/2 00405_Recidivism_Criminal_History.pdf.). Male offenders with a criminal history category ("CHC") of six have a 56.3% recidivism rate. *Id.* at p. 28. Offenders who are between 31 and 35 years of age at the time of sentencing and have a CHC of six have a 59.3% recidivism rate. *Id.* Offenders who are black and have a CHC of six have a 60.7% recidivism rate. *Id.* Offenders with a CHC of six who were unemployed in the year prior to their instant offense have a 54.5% recidivism rate. *Id.* at p. 29. Offenders with a CHC of six who have less than a high school education at the time of the instant offense have a 59.5% recidivism rate. *Id.* Offenders with a CHC of six who are legally married have a 57.9% recidivism rate. *Id.* Offenders with a CHC of six who used illicit drugs in the year prior to their instant offense have a 56.7% recidivism rate. *Id.*

The same goes for argument three. Judges are not required to address categorical challenges to the guidelines. *United States v. Schmitz*, 717 F.3d 536, 542 (7th Cir. 2013) (explaining that a blanket challenge to the guideline rather than one tailored to a defendant's unique characteristics and circumstances "is not one that the district judge must explicitly address."). *See also United States v. Rivera-Santana*, 668 F.3d 95, 101 (4th Cir. 2012) ("Although a sentencing court may be entitled to consider policy decisions underlying the Guidelines, including the presence or absence of empirical data . . . it is under no obligation to do so."); *United States v. Aguilar-Huerta*, 576 F.3d 365, 368 (7th Cir. 2009) ("[The judge] should not have to delve into the history of a guideline so that he can satisfy himself that the process that produced it was adequate to produce a good guideline."). An argument can hardly be considered "strong" if the sentencing judge is not even obligated to consider it, and therefore counsel cannot be considered deficient for failing to make it. Furthermore, even if Rodney Holmes had made this argument, Johnson cannot show a reasonable probability that he would have received a lesser sentence. Judge Stiehl was aware of the advisory nature of the guidelines, but he implicitly concluded that the career offender guideline should be applied in Johnson's case based on his "reprehensible" conduct throughout his life and his substantial criminal history. SDIL Case No. 3:09-cr-30025, Doc. 60.

In sum, there is no reasonable likelihood that but for Mr. Holmes's failure to make the particular arguments outlined above that Johnson would have received a lesser sentence.

## CERTIFICATE OF APPEALABILITY

Should Johnson desire to appeal this Court's ruling dismissing his motion, he must first secure a certificate of appealability, either from this Court or from the Court of Appeals. *See* FED. R. APP. P. 22(b); 28 U.S.C. § 2253(c)(1). Pursuant to § 2253, a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."

This requirement has been interpreted by the Supreme Court to mean that an applicant must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Johnson need not show that his appeal will succeed, but he must show "something more than the absence of frivolity" or the existence of mere "good faith" on his part. *Miller-El v. Cockrell*, 537 U.S. 322, 337, 338 (2003). If the district court denies the request, a petitioner may request that a circuit judge issue the certificate of appealability. FED. R. APP. P. 22(b)(1)-(3).

For the reasons detailed above, the Court has determined that Johnson has not stated any grounds for relief under § 2255, and reasonable jurists could not debate that conclusion. Thus, Johnson has not made "a substantial showing of the denial of a constitutional right," and a certificate of appealability will not be issued.

## CONCLUSION

The Government's Motion to Strike Attorney Affidavits (Doc. 51) is **GRANTED**, and Wendell Johnson's Third Amended Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 (Doc. 50) is **DENIED**. The Court **DECLINES** to issue a

certificate of appealability.

This action is **DISMISSED with prejudice**, and the Clerk of Court is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED:   April 8, 2016**

s/ Nancy J. Rosenstengel
**NANCY J. ROSENSTENGEL**
**United States District Judge**